IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| Shawn Garl and Danielle Garl, | ) |
| | ) Case No. _____ |
| Plaintiffs, | ) |
| | ) **COMPLAINT** |
| v. | ) |
| | ) **Jury Trial Demanded** |
| Genesee Valley Auto Mall, Inc. dba Randy Wise Auto Mall, | ) |
| | ) |
| Defendant. | ) |

## NATURE OF ACTION

1.  This is an action brought under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. and its implementing Regulation Z, 12 C.F.R. Part 226 (collectively "TILA").

## JURISDICTION AND VENUE

2.  This Court has jurisdiction under 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331.

3.  Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), where the acts and transactions giving rise to Plaintiffs' action occurred in this district.

## PARTIES

4.  Plaintiffs, Shawn Garl and Danielle Garl ("Plaintiffs"), are natural persons who at all relevant times resided in the State of Michigan, County of Genesee, and City of Otisville.

5.  Defendant, Genesee Valley Auto Mall, Inc. dba Randy Wise Auto Mall ("Defendant"), is a Michigan corporation who at all relevant times was engaged in the business of selling and financing motor vehicles.

6.  At all relevant times, Defendant, in the ordinary course of its business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed

1

or which, by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action is initially payable.

7. Defendant is a creditor within the meaning of the Truth in Lending Act, 15 U.S.C. § 1602(g) and Regulation Z, 12 C.F.R. 226.2(17).

## FACTUAL ALLEGATIONS

8. In January of 2016, Plaintiffs were in need of an automobile to use for their own personal, family, and household purposes.

9. Ms. Garl corresponded with Defendant regarding its inventory and whether it had any vehicles in stock that would fit her needs.

10. After about two weeks of communications, Defendant advised Ms. Garl that they had the vehicle she was looking for, a 2010 GMC Acadia (the "Vehicle").

11. On or about January 26, 2016, Plaintiffs visited Defendant's dealership to look at the vehicle.

12. They arrived around 5:00 p.m., and found that the Vehicle was not at the lot as Defendant had represented.

13. Nonetheless, Plaintiffs waited patiently for Defendant's salesman to bring the Vehicle to Defendant's lot, so they could examine it and take if for a test drive.

14. Eventually, Defendant's salesman arrived with the Vehicle and Plaintiffs decided to purchase it.

15. The parties then began to negotiate the terms of the sale.

16. By this time, the sun had gone down, and because one of Defendant's employees was celebrating a birthday that day, and Defendant's employees were in a rush to go to the celebration, nearly all of Defendant's employees had left.

17. Because Plaintiffs could not afford to pay cash for the vehicle, Defendant sold it to them on credit.

18. During the negotiations for the purchase of the Vehicle, Defendant's employee, "Derrick," represented to Plaintiffs that they were required to purchase GAP insurance and an extended warranty for their vehicle loan to be approved.

19. Plaintiffs purchased GAP insurance as well as an extended warranty for the Vehicle based upon Derrick's representations that they were required in order to their loan to be approved.

20. Plaintiffs would not have purchased GAP insurance or an extended warranty if Derrick had not represented that they were required for their credit sale to be approved.

21. To complete their purchase, Plaintiffs executed a stack of documents that Defendant's salesman, Derrick, presented to them.

22. Upon information and good-faith belief, included in this stack were two documents that included recitals stating that contrary to Derrick's representations, GAP insurance and the extended warranty were voluntary.

23. Derrick rushed Plaintiffs through the execution of these documents quickly indicating what each document was and directing Plaintiffs where to sign.

24. Upon information and good-faith belief, Derrick rushed Plaintiffs through the signing of the documents with the intent that they would not discover the recitals regarding voluntariness and uncover his deception, or so that he could leave as soon as possible to get to his co-worker's birthday celebration.

25. By the time Plaintiffs had completed their purchase, Defendant's dealership had been closed for several hours and it was well after 9:00 P.M.

26. Upon information and good faith belief, the stack of documents Plaintiffs signed also included a retail installment contract dated January 26, 2016.

27. After signing all the necessary documents, Defendant took possession of Plaintiff's trade in vehicle, and provided Plaintiffs a loaner vehicle to use while it performed last minute repairs on the vehicle they had purchased.

28. Plaintiffs then went home and later took possession of the Vehicle.

29. About a week later, Defendant contacted Plaintiffs and advised them that the bank to which Defendant had attempted to assign their contract, refused to take assignment of the contract due to clerical defects.

30. Derrick represented to Plaintiffs that they had to execute a new set of documents for the deal to go forward.

31. Derrick went to Plaintiffs' home and brought a new set of documents for Plaintiffs to execute.

32. Derrick represented to Plaintiffs that the documents were identical to the documents they had previously signed, and advised Plaintiffs that there was no reason to read them and instructed Plaintiffs to just sign them.

33. In reliance on Derrick's representations, Plaintiffs quickly signed the second set of documents as Derrick directed.

34. The second set of documents included two documents that contained recitals stating that, contrary to Derrick's earlier representations, GAP insurance and the extended warranty were voluntary.

35. Upon information and good-faith belief, Derrick rushed Plaintiffs through the signing of the second set of documents with the intent that they would not discover the recitals regarding voluntariness and uncover his deception.

36. Notwithstanding the fact that the documents were executed about a week after the first set, Defendant "back dated" the second set of documents to indicate that they had been signed on January 26, 2016.

37. The second set of documents also included a retail installment contract (the "Contract"), back dated to January 26, 2016.

38. The Contract included a disclosure statement required by the Truth in Lending Act.

39. The Truth in Lending Disclosure provided to Plaintiffs on the Contract disclosed an "annual percentage rate" of 2.490%, a "finance charge" of $1,940.59, and an "amount financed" of $25,011.89.

40. The Itemization of Amount Financed disclosed on the contract indicates that Plaintiffs purchased GAP coverage at a price of $695.00 and an extended warranty at a price of $1,800.00.

41. Both of these amounts were included in the "amount financed" and neither was included in the "finance charge" that Defendant disclosed in its Truth in Lending Disclosures to Plaintiff.

## COUNT I
## VIOLATION OF 15 U.S.C. § 1638(a)

42. Plaintiffs repeat and re-allege each and every factual allegation above.

43. The Truth in Lending Act, 15 USC § 1605(a), 12 C.F.R. 226.4(a) instruct that the

5

"finance charge" "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."

44. In interpreting the TILA, special deference must be paid to the Federal Reserve Board's ("FRB") interpretation, because "Congress has specifically designated the [Federal Reserve] Board as the primary source for interpretation and application of the TILA . . . ." *Hess v. Citibank, (S. Dakota), N.A.*, 459 F.3d 837, 842 (8th Cir. 2006)).

45. Thus, "[u]nless demonstrably irrational, the Federal Reserve Board's interpretations are dispositive of TILA disputes." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S. Ct. 790, 797, 63 L. Ed. 2d 22 (1980).

46. Moreover, if courts deviate from the strict interpretation of the TILA in search of a more "functional approach," the FRB takes action to overturn the court's decision. *See Hamm v. Ameriquest Mortgage Co.*, 506 F.3d 525, 529 (7th Cir. 2007) (explaining how the Seventh Circuit adopted a hyper technical approach to TILA in response to the FRB's efforts to upend its decision in *Carmichael v. Payment Ctr., Inc.*, 336 F.3d 636, 641 (7th Cir. 2003), and the FRB specifically identifying the court's decision as the impetus for its action).

47. The FRB, has declared the voluntariness of add-on products, like GAP insurance and extended warranties to be a factual issue ascertainable only "by reference to all of the circumstances of a particular transaction. Inquiry into these circumstances, of course, is not foreclosed by the presence of a customer's signature on an insurance authorization." Federal Reserve Board Staff Letter of December 20, 1977, No. 1270, Consumer Credit Guide (CCH) ¶ 31,756.

48. The FRB, in March 1978, elaborated on its guidance as follows:

> While the customer's signature on a document would be some evidence of voluntariness, of course, **it would not conclusively establish that the insurance was not required**. Any number of collateral acts or practices by a creditor could negate the apparently affirmative nature of the customer's election to purchase insurance.

Federal Reserve Board Staff Letter of March 21, 1978, 5 Cons. Cred. Guide (CCH) ¶31,777 (emphasis added).

49. In light of the FRB's guidance, recitals regarding voluntariness do not establish that a given product was voluntary. *See Robinson v. Carport Sales & Leasing, Inc.*, No. 6:14-CV-1358-ORL-TBS, 2015 WL 224655, at *3 (M.D. Fla. Jan. 15, 2015) (GAP insurance could be compulsory despite contract stating GAP was voluntary); *Hager v. Am. Gen. Fin., Inc.*, 37 F. Supp. 2d 778, 784 (S.D.W. Va. 1999) (credit life insurance could be required despite language to the contrary in contract); *In re Milbourne*, 108 B.R. 522, 541 (Bankr. E.D. Pa. 1989) ("if a lender does in fact misrepresent to customers that insurance is required, even though the loan contracts unequivocally state that the purchase of insurance is optional, a violation of UDAP and TILA could be established"); *Kaminski v. Shawmut Credit Union*, 494 F. Supp. 723, 729 (D. Mass. 1980) (credit life was not voluntary despite declaration to the contrary); *In re Cruz*, 441 B.R. 23, 33 (Bankr. E.D. Pa. 2004) (credit insurance was mandatory despite notation that it was optional); *Marine Midland Bank v. Burley*, 73 A.D.2d 1041, 1042, 425 N.Y.S.2d 429, 431 (1980); *Matter of Dickson*, 432 F. Supp. 752, 759 (W.D.N.C. 1977) ("whether the insurance was not required . . . of course, is not conclusively established by the statement on the disclosure that it was not required").

50. To prove that a product is actually compulsory despite contract language to the contrary, a "borrower is obliged to prove that (1) the lender affirmatively represented, by words

or by conduct, that [the product] was in fact required; and (2) as a result of the lender's actions, the borrower purchased [a product] that it is likely that (s)he would not have otherwise purchased. *In re Cruz*, 441 B.R. 23 (Bankr. E.D. Pa. 2004) (citing *In re Milbourne*, 108 B.R. 522, 542 (Bankr. E.D. Pa. (1989))

51. Defendant's employee represented to Plaintiffs that they had to purchase GAP insurance and an extended warranty for their loan to be approved.

52. As a result of Defendant's employee's representations Plaintiffs purchased both GAP insurance and an extended warranty, which they would not have purchased but for Defendant's employee's representations.

53. Because Defendant made purchase of GAP insurance and an extended warranty a condition of financing the transaction, the TILA required the cost of the GAP coverage and the extended warranty to be included as finance charges in calculating the "amount financed," the "annual percentage rate," and the "finance charge" on the Contract.

54. Because Defendant did not include the cost of the GAP coverage or the extended warranty in the "finance charge" in the Contract, Defendant therefore did not disclose the actual "finance charge" associated with the transaction in the Truth in Lending disclosures provided to Plaintiffs.

55. Because Defendant did not include the amount paid for the GAP coverage or the extended warranty in the "finance charge," Defendant therefore did not disclose the actual "finance charge expressed" as an "annual percentage rate" in the Truth in Lending disclosures provided to Plaintiffs.

56. Because Defendant included the amount paid for the GAP coverage or the extended warranty in the "amount financed," Defendant therefore did not disclose the actual

"amount financed" in the Truth in Lending disclosures provided to Plaintiffs.

57. Defendant violated 15 U.S.C. § 1638(a)(2) when it failed to accurately disclose the "amount financed" to Plaintiffs.

58. Defendant violated 15 U.S.C. § 1638(a)(3) when it failed to accurately disclose the "finance charge" to Plaintiffs.

59. Defendant violated 15 U.S.C. § 1638(a)(4) when it failed to accurately disclose the finance charge expressed as an "annual percentage rate" to Plaintiffs.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a) Adjudging that Defendant violated 15 U.S.C. § 1638(a)(2) and Regulation Z, 12 C.F.R. 226.18(b);

b) Adjudging that Defendant violated 15 U.S.C. § 1638(a)(3) and Regulation Z, 12 C.F.R. 226.18(d);

c) Adjudging that Defendant violated 15 U.S.C. § 1638(a)(4) and Regulation Z, 12 C.F.R. 226.18(e);

d) Awarding Plaintiffs statutory damages, pursuant to 15 U.S.C. § 1640(a)(2), in the amount of twice the finance charge;

e) Awarding Plaintiffs actual damages, pursuant to 15 U.S.C. § 1640(a)(1);

f) Awarding Plaintiffs reasonable attorneys' fees and costs incurred in this action, pursuant to 15 U.S.C. § 1640(a)(3);

g) Awarding Plaintiffs any pre-judgment and post-judgment interest as may be allowed under the law;

h) Awarding such other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

60. Plaintiffs are entitled to and hereby demand a trial by jury.

Dated: October 18, 2016

                                      Respectfully submitted,

                                      <u>s/Joseph Panvini</u>
                                      Joseph Panvini
                                      Thompson Consumer Law Group, PLLC
                                      5235 E. Southern Ave. D106-618
                                      Mesa, AZ 85206
                                      Telephone: (602) 388-8875
                                      Facsimile: (866) 317-2674
                                      jpanvini@consumerlawinfo.com
                                      Attorney for Plaintiff