Shawn Garl and Danielle Garl,

      Plaintiffs,

v.                               Case No. 16-13712

Genesee Valley Auto Mall,        Sean F. Cox
                                   United States District Court Judge

      Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

What does $700 buy? For Plaintiffs, who purchased a vehicle from Defendant, $700 bought unwanted GAP insurance and over a years' worth of litigation.  Plaintiffs allege that Defendant violated the Truth in Lending Act (TILA) during the transaction in two ways. First, by failing include the cost of GAP coverage in the finance charge listed on the retail installment sales contract.  Second, by improperly backdating a revised sales contract, thereby overstating the finance charge by $11.94.

Discovery has concluded and Defendant has moved for summary judgment. The Court shall decide the motion on the briefs, the issues having been adequately presented therein.  E.D. Mich. LR 7.1(f)(2).

For the reasons below, the Court shall grant in part and deny in part the Motion for Summary Judgment.  The Court shall deny the motion as to Plaintiffs' first claim because a material question of fact exists as to whether the GAP insurance was compulsory, in which case it should have been included in the finance charge.  But the Court shall grant the motion as to

Plaintiffs' second claim because the finance charge was properly calculated from the date the first contract was signed and consummated.

## BACKGROUND

On January 26, 2016, Plaintiffs Shawn and Danielle Garl went to Defendant Genesee Valley Auto Mall's dealership to purchase a 2010 GMC Acadia. D. Garl Dep., p. 16-17. After arriving at the dealership, they test drove the vehicle and began discussing the transaction with salesman Derrick O'Keefe. *Id*. at 18. At some point, they discussed GAP insurance, a type of insurance that pays the difference between the total loss price of a vehicle and the outstanding balance on the loan. *Id*. at 22-23; O'Keefe Dep., p. 15. O'Keefe represented that Plaintiffs had to purchase GAP insurance for their loan to be approved. D. Garl Dep., p. 23. Based on his representations, Plaintiffs bought the insurance for $695. Def. Ex. B. Plaintiffs did not want, and would not have purchased, GAP insurance had they not believed it was mandatory. D. Garl Dep., p. 25-26.

O'Keefe eventually presented Plaintiffs with a retail installment sales contract, which they had to sign to complete the transaction. *Id*. at 24. Plaintiffs briefly reviewed its language before signing and initialing in the various places O'Keefe indicated. *Id*. at 24-25. The contract included forms indicating that the GAP insurance was optional, not mandatory. Def. Ex. B. The contract's truth in lending disclosure provided that the sale price was $27,052.48, the amount financed was $25,011.80, the finance charge was $1,940.59, and the annual percentage rate was 2.49%. *Id*. First payment was due on February 25, 2016. *Id*.

A few days later, O'Keefe contacted Plaintiffs and indicated that he needed them to re-sign the sales contract. O'Keefe Dep., p. 61-62. The lender–Financial Plus Credit Union–had

asked for some minor changes to be made to the contract. *Id*. at 61. First, because the original

contract designated the vehicle model with the initials "AC", the credit union requested that the

contract be modified to state "Acadia." *Id*. Second, the credit union asked that a section of the

contract be re-typed for legibility purposes. *Id*. Nothing in the second contract changed any of

the financial terms or the payment commencement date. *Compare* Def. Ex. B *with* Def. Ex. G.

Plaintiffs signed the contract as directed. D. Garl Dep., p. 29. Although it was signed on

February 2, 2016, it was backdated to January 26, 2016, the date Plaintiffs signed the original

contract. O'Keefe Dep., p. 66.

Eight months later, Plaintiffs filed this action, alleging that Defendant violated the TILA

by failing to include the cost of GAP insurance in the finance charge in the contract, 15 U.S.C.

§ 1638(a), and by improperly backdating the sales contract, thereby overstating the finance

charge assessed on Plaintiffs' loan, 15 U.S.C. § 1638(a)(3) (Doc. # 16). Defendant has moved

for summary judgment (Doc. # 19) and Plaintiffs have responded (Doc. # 20).

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact

exists where "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id*. The Court "must view the evidence, all facts, and any inferences that

may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v.*

*Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

## ANALYSIS

"[T]he TILA is a remedial statute which serves two purposes: (1) to permit an individual

consumer to recover for her injuries; and (2) to deter socially undesirable lending practices."

*Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 801 (6th Cir. 1996). It "requires creditors make

certain disclosures as to the terms of lending arrangements and provides for civil liability for

failure to comply with its provisions." *United States v. Petroff-Kline*, 557 F.3d 285, 294 (6th

Cir. 2009); 15 U.S.C. § 1640(a). The Act is strictly enforced; "once a court finds a violation of

the TILA, no matter how technical, the court has no discretion as to the imposition of civil

liability." *Purtle*, 91 F.3d at 801.

This case concerns several disclosures that are required for each consumer credit

transaction: The "amount financed" (the amount of credit of which the consumer has actual use),

15 U.S.C. § 1638(a)(2); the "finance charge" (the cost of consumer credit as a dollar amount),

§ 1638(a)(3); 12 C.F.R. 226.4(a); and the finance charge expressed as an "annual percentage

rate", § 1638(a)(4). When considering whether Defendant properly made these disclosures, the

Court must remain mindful of the regulations promulgated by the Federal Reserve System's

Board of Governors to implement the Act's requirements. *See Petroff-Kline*, 557 F.3d at 294.

The Court must give these regulations, and any Federal Reserve Board staff opinions construing

them or the Act, due deference. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980).

### I. Whether Defendant Violated the TILA
### by Not Including the Cost of GAP Insurance in the Finance Charge

In Count One, Plaintiffs claim that Defendant violated the TILA by failing to include the

cost of GAP insurance ($695) in the finance charge, instead including it in the amount financed.

They argue that the cost of the insurance should have been included in the finance charge

because O'Keefe represented to them that its purchase was required to secure financing.

"The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4(a). Charges for insurance and debt cancellation coverage, such as GAP insurance, may be excluded from the finance charge if: (1) "The insurance coverage is not required by the creditor, and this fact is disclosed in writing."; (2) "The premium for the initial term of insurance coverage is disclosed in writing."; and (3) "The consumer signs or initials an affirmative written request for the insurance after reviewing" specified disclosures. 12 C.F.R. § 226.4(d)(1).

To begin with the obvious, GAP insurance is a charge payable directly by the consumer. Thus, Defendant had to include it in the finance charge if it was imposed as a condition of extending credit to Plaintiffs to purchase the vehicle. Whether it was is the crux of the dispute. Plaintiffs maintain that their purchase of the GAP insurance was compulsory; O'Keefe told them it was required. Defendants contend that the insurance was voluntary; several documents in the contract, which Plaintiffs signed or initialed, explicitly state that GAP insurance is voluntary and not required to obtain credit.

Although these documents, accompanied by Plaintiffs' signatures, may not foreshadow success before a jury, they do not conclusively entitle Defendant to summary judgment. The Federal Reserve Board has instructed that whether insurance is required or optional is a factual question and that an inquiry into the circumstances is "not foreclosed by the presence of a customer's signature on an insurance authorization." *In re Cruz*, 441 B.R. 23, 32 (Bankr. E.D. Penn. 2004), quoting Federal Reserve Board Staff Letter of December 20, 1997, No. 1270, Consumer Credit Guide (CCH) ¶ 31, 756. Thus, "courts that have addressed this issue have held

that a contract does not provide conclusive proof of insurance being optional if a creditor represented otherwise that insurance was required." *Beltran v. USA Auto Inc.*, 2015 WL 12672084 at * 2 (D. Ariz. 2015) (citing cases); *Robinson v. Carport Sales & Leasing, Inc.*, 2015 WL 224655 at * 3 (M.D. Fla. 2015) (citing cases). Defendant does not grapple with these cases and has not provided any persuasive reason why the Court should not defer to the Federal Reserve Board and take the same approach.[1]

This approach provides Plaintiffs with an avenue to prove that the GAP insurance was compulsory, despite their signatures on a contract stating otherwise. To prove this, they must show that "(1) the lender affirmatively represented, by words or by conduct, that insurance was in fact required; and (2) as a result of the lender's actions, [they] purchased insurance coverage that it is likely that [they] would not have otherwise purchased." *Cruz*, 441 B.R. at 33.

Viewing the evidence in the light most favorable to Plaintiffs, material questions of fact exist as to both of these elements. Plaintiffs testified that O'Keefe told them that GAP insurance was required and that they would not have purchased the insurance if it had not been required. In other words, a reasonable jury could conclude, based on this testimony, that Plaintiffs' purchase of GAP insurance was compulsory. And if the GAP insurance was required, then Defendant erroneously failed to include it in the finance charge, thereby violating § 1638(a). Although the provisions in the contract stating that the GAP insurance was optional may be powerful evidence that no TILA violation occurred, the Federal Reserve Board has instructed that these provisions are not conclusive. Thus, they cannot justify summary judgment here and

---

[1] Defendant's reliance on *In re Jones*, 2007 WL 1725593 (N.D. Ala. 2007) is misplaced. *Jones* addressed a consumer's allegations that a creditor's written disclosures about GAP insurance were faulty, not that the GAP insurance was compulsory. *Id*. at * 7.

the Court shall deny Defendant's motion as to Count One.

**II. Whether Defendant Overstated the Finance Charge in the Second Contract**

In Count Two, Plaintiffs allege that Defendant violated TILA by overstating the finance charge assessed on their loan. They argue that Defendant improperly backdated the second retail installment sales contract to January 26, thereby calculating the finance charge based on that date instead of February 2. This, they allege, caused the finance charge to include seven days' interest that did not actually accrue on their loan, because interest did not begin to accrue until February 2. The difference? Eleven dollars and ninety-four cents.

As is apparent, Plaintiffs have embraced the principle that hypertechnicality reigns supreme in TILA cases. *See Purtle*, 91 F.3d at 801; *see also Smith v. Cash Store Mgt., Inc.*, 195 F.3d 325, 328 (7th Cir. 1999) ("Subject to narrow exceptions, hypertechnicality reigns in the application of TILA.") (internal quotations omitted). This pedantry is exacerbated by the alleged violation falling a mere $1.94 outside of the regulatory margin of error. 12 C.F.R. § 226.18(d)(2) (declaring that the amount disclosed as the finance charge in transactions involving an amount financed of more than $1,000 is considered accurate if it is not more than $10 above or below the correct amount). But even piddling claims are authorized by the TILA's language; liability must be imposed for even the most technical of violations. *See Purtle*, 91 F.3d at 901. So, the Court must turn to the merits of Plaintiffs' claim.

TILA disclosures must be made "before consummation of the transaction." 12 C.F.R. § 226.17(b). "Consummation means the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). "Thus, 'consummation' occurs when a borrower signs the loan documents and becomes obligated to pay, despite the fact that the loan

may be contingent on the lender's approval." *Petroff-Kline*, 557 F.3d at 296.

To comply with the TILA, Defendant had to provide Plaintiffs with the proper disclosures, including an accurate finance charge amount, before their transaction was consummated. Defendant did so; listing the finance charge of $1,940.59 in the loan documents that Plaintiffs signed on January 26. By signing the documents, Plaintiffs consummated the transaction; they became obligated to pay at that time. *See id.* And because the transaction was consummated on January 26, it was appropriate (and consistent with the TILA) for Defendant to calculate the finance charge using that day as the start date.

That Plaintiffs signed a second contract seven days later does not alter this conclusion. The second version only made cosmetic changes to the contract by changing "AC" to "Acadia" and altering some typeface. All of the other terms of the agreement, including Plaintiffs' financial obligations and the date of the first payment, remained the same. Because the revised contract did not alter *a single obligation* that Plaintiffs had under the initial contract, the revisions did not change the date of consummation. *See Chapman v. JPMorgan Chase Bank, N.A.*, 651 F. App'x 508, 512 (6th Cir. 2016) (holding that because the alleged existence of a true creditor did not change the plaintiffs' obligations under the agreement, it did not change the date of consummation). In fact, the revised contract could not have changed the consummation date because Plaintiffs did not incur a new obligation to pay when they signed the contract.

Indeed, Defendant's conduct was consistent with the central goal of the TILA: "to provide meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1068 (11th Cir. 2004), quoting 15 U.S.C. § 1601(a). Understandably, for disclosures to be

8

"meaningful," they must be accurately made before the transaction is consummated. *See* 12 C.F.R. § 226.17(b). That occurred here. Nothing in the second contract, which did not change a single financial term, impaired Plaintiffs' ability to make an informed decision regarding their credit. *See* § 1601(a). Thus, this is not a scenario in which the TILA's protections are required.

Finally, this conclusion is not altered by Plaintiffs' principal case, *Rucker v. Sheehy Alexandria, Inc.*, 228 F. Supp. 2d 711, 717 (E.D. Va. 2002). Although Plaintiffs characterize it as "factually identical" to their case, they ignore key distinguishing facts. In *Rucker*, like here, the plaintiff signed a retail installment sales contract and then signed a second one ten days later. *Id*. at 713-14. She then sued under the TILA after the dealership backdated the second contract. *Id*. at 715. But this is where the similarities end. In *Rucker*, unlike here, the first agreement was null and void when the second agreement was signed. *Id*. at 713. And the second agreement considerably altered the financial terms, including the amount financed, the finance charge, and the annual percentage rate. *Id*. at 714. In those circumstances, the court sensibly held that the plaintiff did not become obligated on the credit transaction until the day she signed the second agreement, thereby making that the date when the transaction was consummated. *Id*. at 716. Not so here; Plaintiffs' first agreement was never nullified and their second agreement did not alter any of the initially agreed upon financial terms. Thus, unlike in *Rucker*, Plaintiffs' consummation date remained unchanged.

In sum, because Plaintiffs' agreement was consummated on January 26, the second retail sales installment contract properly calculated the finance charge by using that day as the start date. Thus, it appropriately included the paltry $11.94 with which Plaintiffs take issue. Therefore, because a reasonable jury could not conclude that Defendant violated the TILA on

this basis, the Court shall grant Defendant's Motion for Summary Judgment on Count Two.

## CONCLUSION

For the reasons above, IT IS ORDERED that Defendant's Motion for Summary

Judgment is GRANTED IN PART AND DENIED IN PART. The Court DENIES Defendant's

motion as to Count One but GRANTS Defendant's motion as to Count Two. Accordingly, the

TILA claim in Count One shall proceed to trial.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: February 21, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on
February 21, 2018, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager